**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

TRUTH TECHNOLOGIES INC.,

    Plaintiff,

v.

JONATHAN ARNOLD, JAMES HUGHES,
PATRICK BRANNEN, CHANDRA MOULI
a/k/a CHANDRAMOULI
GANGABAI/NATARAJAN,
KEITH FRITZ,
ANDREW PUCKETTE,
DIANE ACKERMAN a/k/a DIANE RUDNET,
eSPEAR FOUNDING PARTNERS I LLC,
eSPEAR FOUNDING PARTNERS II LLC,
eSPEAR FOUNDING PARTNERS III LLC,
eSPEAR FOUNDING PARTNERS IV LLC,
eSPEAR LLC, and
eSPEAR MANAGEMENT PARTNERS LLC,

    Defendants.

Case No. 17-cv-00833 (LO)(JFA)

**DECLARATION OF JONATHAN ARNOLD IN OPPOSITION TO MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jonathan Arnold declares as follows:

1. I make this declaration on personal knowledge in opposition to plaintiff Truth Technologies Inc.'s (TTI's) motion for a temporary restraining order and for a preliminary injunction.

**Services as an Employee and Non-Employee of TTI**

2. I was TTI's Vice President of Development Operations from January 6, 1997 through April 30, 1997, Senior Vice President of Development Operations from March 23, 2012 to August 31, 2015, and Chief Operating Officer from September 1, 2015 to February 28, 2017.

3.      I was first employed at TTI from January 6, 1997 through April 30, 1997 pursuant to an Employment Agreement entered into December 23, 1996. That initial period of employment ended because, after some salary payments effectively "bounced" in March 1997, Egide Thein (Chairman) told me and the other employees that he had run out of money, and Christopher Ashe (President), told me and the other employees to go home.

4.      I was again hired by TTI from March 19, 2012 to February 28, 2017 pursuant to a February 26, 2012 offer of employment, initially as VP Development and Operations. I also served during much of this period as Chief Operating Officer, assisting in developing "pitches" for new business and for capital raising. In addition, I served on TTI's Board of Directors or perhaps as a "de facto" member of the Board starting in or about August 2015 – although in retrospect, it is not clear to me that the appointment was valid: TTI had not held shareholder meetings for many years. I don't know the mechanics of how I was elected to or designated to the Board. Further, I was not named as a board member on TTI's d/b/a filing for Florida for General Fintech Inc. on January 6, 2017. It's my understanding, that as a d/b/a, the Board of General Fintech should be identical to the Board of TTI.

5.      Incidentally, the complaint alleges that I "resigned" from TTI on February 28, 2017. (Compl. ¶28; see also Compl ¶ 34). This is not true. I can only assume that this allegations was made because the non-compete provision of my 2012 contract (annexed to the Complaint as part of Ex. 2) provides, at paragraph 7(b), that there is a non-compete obligation only after a voluntary resignation (or a termination for cause), and not after a termination without cause. Similarly, in 2012, TTI agreed to grant me 10% of the equity in TTI, but half (5%) could be "clawed back" if I resigned or was terminated for cause.

6. Suffice it to say, I was terminated without cause on February 20, 2017, and did not resign. Attached as **Exhibit 1** is a copy of my email dated February 20, 2017 to Egide Thein. In that email, I confirm, among other things, that he had told me that my last day of work was to be February 28, 2017.

**I Wrote the Core of Sentinel on My Own Time as a Non-Employee of TTI**

7. Even before joining TTI, I built or was closely involved in the building of a substantial amount of the software and systems used by TTI including the key software underlying TTI's "Sentinel" software. The core of that software was developed by me when I was NOT an employee of TTI: part of it prior to being hired in 1996, and the bulk of it during the period after April 1997 that I was not an employee of TTI and before I was re-hired in 2012. TTI acknowledges as much in emails, and in private placement memoranda and business plans that it circulated in 2008 and thereafter.

8. I had agreed with Mr. Thein, initially in 1996, and then in 2000 and then again in 2012, that I would provide TTI with a license to my software (and then to the expanded and improved version of my software) if he provided me with equity in TTI. He never provided the equity, and when he terminated me, I terminated the license.

9. In the December 1996 agreement (for my employment commencing January 6, 1997), I was supposed to have been provided 3% equity in TTI. This was an equity grant, not options as would have been more typical, because I had already performed the work for which equity was to be granted. The equity was to have been provided as a sign-on bonus in exchange for some 20,000 lines of code and algorithms that I had written while not an employee, which I provided to TTI. But TTI never provided the 3% equity sign-on bonus, and as previously noted, I was terminated shortly after starting, allegedly because of TTI's financial difficulties.

10.     I had started developing this "pattern recognition" technology starting in 1990. In 1992, I joined The Analytic Sciences Corporation ("TASC"), where I led a team of developers.

11.     The complaint falsely alleges that "[i]n 1996, Thein acquired by contract from TASC, Inc., and transferred to TTI, the software code upon which TTI's Sentinel product is based. …. All codes written … have been written for TTI as a work made for hire." (Compl. ¶19.)

12.     This is not true. Mr. Thein engaged TASC in July 1996 to spend six weeks on a study of what it would take to create a money laundering detection system (the "Study"). (A copy of the contract is annexed to the Compl. as Ex. 4.) This Study did not involve the creation of money laundering software. Rather, it was the pre-development analysis of what would be needed if such software subsequently were to be developed, as the contract makes clear. I was not part of the group at TASC that was assigned to the Study, and the contract for this Study did not transfer any software that I had independently written and developed, including pattern recognition software and algorithms that I had been working on starting in 1990.

13.     My pattern recognition software and algorithms were written and developed before the agreement for the Study was executed. Attached as **Exhibit 2** is a Business Plan, dated June 2008, that TTI distributed as part of a private placement memorandum offering. In that business plan TTI told its prospective investors that my pattern recognition technology was initially developed by me in the early 1990s. At Section 7.2.2 the Business Plan refers to me as a senior manager (though I was not a senior manager at the time); states that I and the other "senior managers" were assisting in an "executive" marketing effort directed at the major U.S. and international banking associations, financial institutions, and government agencies; and notes that in a trip to Luxembourg, Switzerland, Monaco and Liechtenstein, "TTI demonstrated MLDS

(a precursor to the TTI product line) to the Minsters of Finance and to the Banking Associations."

14. TASC did not write or deliver any software to Mr. Thein or TTI. Mr. Thein asked TASC for a quote, and was quoted $748,824.22 (also part of Compl. Ex. 4). This was too expensive, and TASC was not retained to write the software. Since TASC did not write or deliver any software to Mr. Thein or TTI, the claim that TASC provided software to Mr. Thein or TTI as a work for hire is not true.

15. Rather, from September 1996 until I was hired by TTI in January 6, 1997, I independently wrote the software. I wrote code for Interfaces to RetrievalWare, including the framework for executing queries; data indexing and query pipelines for Retrieval Ware; the user interface; and a basic version of my Pattern Recognizer. I called this code the Money Laundering Detection System ("MLDS").

16. I wrote MLDS on my own time using my own computers. I did not start at TTI until January 6, 1997.

17. My MLDS code was substantially different from the code TASC had contemplated might be appropriate. In broad overview, TASC had thought that it would be necessary to run the software on a large server. MLDS, however, was intended to run, at least initially, on a laptop.

18. On March 1, 1997, shortly after joining TTI as an employee, at Mr. Thein's request, I presented a working prototype of my MLDS software to investors and prospective investors in TTI.

19. After I was terminated in April 1997 when TTI allegedly ran out of money, I continued to be friendly and cooperate with Mr. Thein, assisting in 1998-2000 in his pitches to

potential investors, ranging from a trip with Mr. Thein and David Olenzak (successor to Mr. Ashe, and then-president of TTI) to Pennsylvania Merchant Group in Conshohocken PA, to going on a "road show" with Dick Spikerman.

20. During this period, I continued to develop my MLDS software. I did not have a work for hire agreement, and was not an employee. Mr. Thein and I discussed how he might license my MLDS software, and he also wished to hire me. Ultimately he agreed that he would provide me a 5% equity stake in TTI and I would provide him a license to the MLDS code that I had written.

21. During the 1998-2000 time period my MLDS software needed updating. Problems at the time included the need to substantially re-write MLDS, because it did not work with then-current versions of RetrievalWare, and to re-write it to work with the updated operating system. Moreover, I also modified and significantly upgraded MLDS (again, not as an employee, and without signing any work-for-hire agreement) by, among other things, enhancing the pattern recognition name-matching algorithm program; and adding a data loader to allow loading of US government data sources, such as the list of specially designated nationals and blocked persons published by the Office of Foreign Assets Contract of the US Department of the Treasury (""OFAC list" and "OFAC").

22. When I completed this, in or about 2000, I designated that version of MLDS as "MLDS Version 1.0." TTI called it MLDS version 1 as well, and this is the software that TTI eventually called "Sentinel."

23. From 200 through 2001, I drafted the Processes Documents to describe the operation of MLDS 1.0 (Sentinel), describing step-by-step how Sentinel/MLDS version 1 works.

24. I also worked with Patrick Brannen and Scott Snowden (both at the time with iDEVCO, to which TTI subcontracted development; later on TTI purchased the assets of iDEVCO) to further develop Sentinel, the underlying data structures and architectural concepts, and the Processes Documents that I had written. The Processes Documents were used for various purposes, including to present to prospective investors in TTI.

25. There are multiple documents in which it is acknowledged that I developed the key software, and that I did so while I was not employed at TTI. According to these same documents, my pattern recognition technology is imbedded in Sentinel – and other TTI products. And all of the business plans that I have seen for the period 2008 through 2011 reference the pattern recognition technology that I wrote and all acknowledge that I was the author.

26. Mr. Thein and I had numerous discussions and negotiations in which he sought to have me re-join TTI, and to license the software that I had written. Mr. Hughes has provided me with an email from Dave Olenzak (then President of TTI) not long before I became employed by TTI in 2012, in which he suggested that I start with salary, and that the equity component (i.e., my compensation for providing a license to my intellectual property) be worked out later.

27. That is precisely what was discussed and occurred. My 2012 contract does not mention equity compensation. Shortly thereafter, and attached as **Exhibit 3**, however, is an email chain from James Hughes to me, dated April 17, 2012, copying Egide Thein, in which James Hughes confirms that I was to be granted 10% of the equity in TTI, 5% "for work and other contributions you have made to TTI over the years, including software code," and 5% as an incentive package, which could be "clawed back" if I was terminated for cause, or resign voluntarily. As Mr. Hughes stated in the email, Mr. Thein had been waiting to have me on board

full time at TTI "for a long time." Mr. Thein responded to the email, "Correction. A very long time!"

28.  Like the 3% in my 1996 contract and our oral agreement in 2000, the 10% equity referenced in the 2012 exchange with Mr. Hughes was never paid to me. And, as a result, I never licensed MLDS version 1 to TTI. I did, however, work at TTI, and revised and expanded MLDS version 1 (now named Sentinel). Sentinel is a derivative work of MLDS version 1. The pattern recognizer that I wrote for MLDS version 1 is a core part of Sentinel, and is necessary for the operation of TTI's business.

29.  I formally notified TTI on April 24, 2017 that it did not have a license to my software – after TTI wrote to me on April 23, 2017 stating that all agreements between me and TTI were cancelled. My view was that if all agreements were terminated, then TTI had no right to continue to use my software. And, of course, since I was never paid the license fee, I am entitled to revoke the license. Copies of the April 23, 2017 and April 24, 2017 emails are attached as **Exhibit 4** and **Exhibit 5**, respectively.

30.  When I was terminated by Mr. Thein, he provided me little over a week to transition over everything to my successor, Darren Spurgeon. The timing was grossly inadequate, since Mr. Spurgeon was not familiar with the software or the systems, and there was no one at TTI who could replace many of the services that I supplied to clients, or who had my knowledge of the systems. Compounding the problem, Mr. Spurgeon was getting married on March 11, 2017.

31.  Even though I had been terminated, I thought to take the high road. After my employment with TTI ended on February 28, 2017, I offered to continue, on a voluntary basis, to provide certain transition, training, and support services to TTI and its customers, in order to

facilitate the transition of running the company day to day, while I was transitioning myself to a new job.

32. I had no obligation to provide any transition services, let alone for free. I did so, however, because I had been involved at TTI for nearly 20 years; I had good relationships with many of the TTI employees and officers and TTI's clients; and I did not want them to experience any harm or disruption.

33. As I stated in my March 17, 2017 email, a copy of which is attached as **Exhibit 6** "this is a favor from me to you all. I am doing this because of a 20 year friendship. There is no contract in place. I am not an employee, not a contractor, have no paper coverage, no agreement to which we can point I made a verbal agreement with Mr. Thein. I have not been paid for this work, and I do not expect it. Clearly I have demonstrated that TTI's trust in me is well founded, **as I have access to the root accounts of all productions systems, and have access to the database of our customers**"(emphasis added).

34. In sum, far from being "surreptitious," I emphasized to Mr. Thein and Mr. Spurgeon that I had root access to all production systems, and had access to the customer database.

35. Adding insult to injury, TTI not only failed to express its gratitude for the voluntary services that I provided, those fully disclosed and voluntary services are being seized on in this lawsuit in an attempt to create a false claim of copyright infringement.

**Updating TTI's Servers During the Transition Period**

36. Among the services I provided during the transition period was updating TTI's software on its servers. I am providing this description of how I updated server software to address allegations in the complaint that I downloaded unauthorized copies of TTI's software

during the transition period, let alone that the absurd allegation that I "surreptitiously and without authorization accessed servers". (Compl. ¶ 29.)

37. To the contrary, I managed all production servers and the cyber-security infrastructure, and I knew that all logins to TTI's servers are recorded. Every member of the team, including me, had a certificate that identified that person to all production servers. Nothing "surreptitious" occurred. I always obtained informed, written consent from TTI before performing any tasks, and my downloading of TTI's server software was done in accordance with TTI's established procedures for safely publishing live updates to its production servers – our procedures captured configurations specific to each production system, which we applied to any new software before applying that software to the production machines. (To the extent it is not obvious, I should add that my authorized copying of TTI's server code to update and upload to TTI's servers in no way deprived TTI of the use of that code, since TTI remains in possession of the original code.) At the end of February 2017, as documented in **Exhibit 7**, I gave Darren Spurgeon a live-training exercise on this procedure when we updated a production server to support the TLS 1.2 protocol.

38. The software updates I performed were sensitive in two respects: <u>First</u>, since I was no longer an employee of TTI, I wanted Mr. Thein, the Board of Directors of TTI, and others at TTI to be fully apprised of the fact that I was accessing TTI's servers. See attached collective **Exhibit 8**, containing some of the multiple emails and notifications that I sent to Darren Spurgeon and Egide Thein confirming what I was doing during the transition period to assist TTI. I did so both because I wanted to protect TTI in the event an external auditor wanted evidence that my post-termination activities were supervised by TTI and because any access by an unauthorized person to TTI's servers would have triggered requirements in TTI's contracts

with its customers and other third parties to provide notification that an unauthorized access had occurred. On information and belief, TTI has never sent any such notification.

39.     I always published my work plans to Mr. Thein and/or the Board of Directors and/or Darren Spurgeon. I always specified what activities I would be performing, and I always received written confirmation from one or both of them before proceeding. And, as noted, I reminded them that I still had "access to the root accounts of all production systems, and have access to the database of our customers." (Email dated March 17, 2017, attached as part of collective Exhibit 8 above.). On no occasion did I access any TTI server without first obtaining such informed consent, nor did I ever access a TTI server to perform an operation different from what I had said I was going to perform.

40.     The <u>second</u> sensitivity associated with updating TTI's server software had nothing to do with the fact that I was no longer employed by TTI. Rather, production servers are accessed 24 x 365 by customers, and customers depend on the correct functioning of the software. Whenever server software is updated on a "live" production system -- which is to say, on a system that customers would be accessing during or immediately after the update -- measures must be taken to ensure that an update does not cause an excessively long system outage (some customers preferred outages less than two hours) or cause the system to fail catastrophically. For that reason, it was the standard procedure at TTI, both during the time that I was employed there and during the transition period (and I assume to this day), to download a copy of the pre-update software from the live server before installing the update. We would do this a couple of weeks in advance of any updates, so that we could carefully plan the updates and update deployment plans well before the updates actually occurred. We then compared the pre-update software to the pending update in the software repository, and we applied any specific

configuration changes and any emergency fixes from the pre-update software to the pending update. That way, we could test the update before putting it into production. And, if an update did cause a catastrophic failure, we had the means to understand what was running on the server before, and could restore the server to the previous working baseline. (I should note that this procedure was not always followed, for instance when an emergency update was urgently required, but we followed the procedure whenever possible.)

**TTI's Falsified Documents**

41. In support of its contention that I was part of a conspiracy to devalue and then acquire TTI, TTI included in its complaint (at paragraph 76) what are purported to be screenshots of a program that I used on which I had a personal account. The program is named Priority Matrix. As explained below, I am convinced that these screenshots are fraudulent, and resulted from someone at TTI obtaining unauthorized access to and use of my personal software account, and that this person changed the document to try to create a false claim.

42. Priority Matrix is a time management software application that allows an individual or multiple individuals working as a team to track progress on projects. Access to Priority Matrix is by paid subscription. I paid for my Priority Matrix subscription out of my own pocket; although TTI promised to reimburse me for the expense if I transitioned it over to TTI, no reimbursement was ever forthcoming and I never transitioned it over to TTI because Darren Spurgeon told me he didn't want it transitioned over to TTI.

43. I used Priority Matrix both for TTI projects and non-TTI projects. For instance, I used Priority Matrix to track various home improvement projects (on the left side of the screen one of the projects is "House"). My Priority Matrix subscription allowed for access by multiple

users, and I added certain TTI team members who were working with me on TTI projects as collaborators.

44. Sometime after the transition period, during the first half of May, 2017, I discovered that I had lost access to my Priority Matrix account. Someone had changed the account password. Although I cannot say for sure how that happened, it would have been easy for someone with access to my TTI email account to request a password reset. (I have not had access to my TTI email account since the last day of the transition period, April 23, 2017.) I noted that the name Darren appears at the top right of the screenshot at complaint paragraph 76, which would support the belief that Darren Spurgeon of TTI was involved in accessing my personal account, modifying my documents, and re-setting my password.

45. Unfortunately, whoever hijacked my Priority Matrix account allowed the subscription to lapse, which means all the data recorded there is lost. I confirmed that my account data was lost in conversations and emails with a Priority Matrix representative.

46. When I saw the purported screenshots at paragraph 76 in the complaint, I initially was at a loss to understand how the screenshots had been made, or even what they referred to. Although I may have used Priority Matrix in connection with eSpear, it was not until after I left TTI. How, then, had someone taken a screenshot of my Priority Matrix account that appeared to show I was working on a project called eSpear in August 2016? Deepening the mystery is the fact that even the name eSpear was not created or mentioned at that time.

47. Other aspects of the purported screenshot puzzled me as well. For instance, in the "ASAP" quadrant of the screenshot is a list of tasks to be completed. One of the crossed through items (indicating that the item had been completed) in that quadrant was "Testimonials from customers." But eSpear did not exist in 2016 (as the complaint notes at ¶ 9, eSpear was

established on February 15, 2017) and it certainly did not have any customers in 2016 from whom it could have obtained testimonials. How could "Testimonials from customers" be a completed item when eSpear did not then exist and had no customers at the time?

48. Another puzzling item I noted on examining the screenshots in the complaint: the last item in the ASAP quadrant of the screenshot is "Move hipchat over." Hipchat was a different piece of collaboration software that I had originally subscribed to for the benefit of TTI. I remember that one of the tasks I had set for myself while at TTI was to transfer the Hipchat account to TTI (so that TTI could handle payment for and administration of the account). I believe that "Move hipchat over" was my shorthand way of reminding myself to make the transfer. We use Hipchat at eSpear, but the subscription has always been paid for and administered by eSpear (hence there would be no need to "move hipchat over" at eSpear).

49. As I continued to look at the supposed "eSpear" screenshot more carefully, I realized that all of the tasks shown pertained to work I did for TTI while employed by TTI. The mystery was why those tasks seemed to be listed under a project heading called eSpear.

50. The mystery was resolved when I realized that Project Matrix allows a user to change a project name at any time, so that an existing project could be renamed eSpear at a later date. That would explain why tasks associated with a TTI project appear in the screenshot under the project name eSpear. In other words, it appears as though an existing project, with task list items dating from August 2016, was later renamed to eSpear. I believe that is why, even though the screenshot shows the project name "ESPEAR" at the top, the item description in the right hand column says it was "created in Pitch Deck" on 8/8/2016, i.e., that Pitch Deck was the name of the project at the time the task was created.

51. Consistently, during the August 2016 time period James Hughes and I were working with Mr. Thein preparing financial statements and other work in connection with potential "pitches" for new business and to obtain new capital. He endorsed this effort during my visit with him in June, 2016, at his house in Naples, Florida. In fact, I had been helping him in efforts to sell TTI or raise capital. For example, Mr. Thein told Regulatory Data Corp ("RDC") that TTI was for sale at the FIBA conference in Miami held from March 7-9, 2016. RDC was concerned that TTI was being sold to LexisNexis and that a competitor of RDC would have access to their data. Mr. Thein refused to tell RDC that a sale of TTI was not a possibility. Mr. Thein asked James Hughes and me to help him with his capital raise effort and for us to lead another management team buyout offer.

**eSpear's Technology and Software is Fundamentally Different From TTI's**

52. I am now the Chief Operating Officer of eSpear LLC. Among other things, I am in charge of writing, and supervising the writing of eSpear's software and systems. As such, I have detailed, first-hand familiarity with eSpear's brand-new software and systems, as well as with the legacy software that TTI ran. As discussed below, although I do own the core legacy pattern recognition software and other software that lies at the heart of the TTI software, the eSpear software is entirely new software. It is designed for multiple users and multiple threads running on multiple processors in the cloud and leveraging all the features of Amazon Web Services. It is intended to be highly reliable and stable, and to be used in ecommerce. By contrast, the legacy software at TTI runs on a database machine and a web server, and is unable to meet high demand or high volume.

53. As discussed above, allegations in the complaint that I made unauthorized copies of TTI's code are false: any copies I made were with TTI's knowledge and according to standard

TTI software upgrade practices. Further, it is also untrue that eSpear has used or intends to use TTI code in implementing eSpear's software. In the first place, much of TTI's software was based on design concepts written over 20 years ago (by me) and although I believe it performed well at the time, it is showing its age. Unburdened by the need to maintain legacy systems, eSpear was free to, and did, write code on a clean slate. We have not incorporated TTI's technology in eSpear and would not do so even if it were freely offered.

54.     eSpear's technology differs from TTI's along two main axes. One of these axes is the algorithms eSpear uses to accomplish its due diligence, anti-corruption, anti-money laundering, and anti-fraud screenings. The other axis is the infrastructure that eSpear has built to provide those screening services to its clients. eSpear's approaches along both the algorithm axis and the infrastructure axis are significantly different from TTI's. For that reason, as I will explain in some detail below, TTI's code base is not helpful to eSpear.

**Algorithms**

55.     Because they were largely developed between 1996 and 2017, TTI's algorithms are designed for a standard server configuration (database server, web server) and for sequential processing of transactions. TTI's algorithms rely on "singletons" to ensure critical code can be executed by only a single thread at a time. TTI's algorithms rely on specific configurations of memory and file systems and databases. TTI's name matching software is a sequential set of functions where names are matched and filtered one at a time. TTI's data loader, which also incorporate my pattern recognition technology, would not work if run in the cloud because it depends on access to identified file systems. By contrast, eSpear's algorithms focus on high speed processing of transactions, applying parallel Oracle (database) processes to detect anomalies in the transaction stream, and leveraging the features and functions of Amazon Web

Services and its extensions, plus integration of my pattern recognizer, to process and match many names in parallel. eSpear's data loader integrates my pattern recognition and transformation technology to quickly support adding additional data sources to the system.

**Infrastructure**

56.     TTI provides its clients with access to screening services in one of two ways: Either the client hosts TTI's software and the hardware that the software runs on within the client's own network, or TTI hosts the software on TTI's hardware and provides access to the software via the Internet. At the time I was fired, TTI had nine servers in various regions around the world for providing access via the Internet.

57.     A limitation of TTI's model is that it cannot scale quickly, meaning that it cannot easily meet a sudden surge in demand. There are only so many servers, and they only have so much capacity. That's not much of a problem for TTI, whose clients tend to have a steady, predictable and not very dynamic need for screening services.

58.     eSpear, on the other hand, wants to be able to provide screening services to companies with extremely dynamic demands for screening services, for instance, real-time screening for large online marketplaces. As an example, on "Cyber Monday" such a marketplace is likely to see a surge in demand far greater than the demand it sees most other days of the year.

59.     One way for eSpear to handle such a spike in demand would be to have a large number of servers that were largely idle most of the time, standing by for the occasional surge. Although that might be an effective solution, it would not be economical. eSpear's approach is to host its software on a platform called Amazon Web Services (AWS). AWS provides its customers with dynamic server capacity. Essentially, a company can rent from AWS exactly as much server capacity as it needs at any given time, while having the option to increase that

capacity almost instantaneously as required. Then, when the increased demand subsides, a company can just as easily and quickly shed its excess capacity.

60. Renting server capacity from AWS, rather than owning one's own servers, is tremendously useful to a company that may experience dramatic swings in demand for its online services. Sentinel was not built to run on the AWS platform. A complete build-it-from scratch approach was required, and that is what we are in the process of completing at eSpear.

**The Owl Servers**

61. Finally, TTI also claims that Patrick Brannen has a Linux-based server (an "Owl server") that it wants back. Mr. Brannen has, to my knowledge, been trying to get TTI to hire a moving company to remove the server for months, and in accordance with TTI's procedures and policies, the hard drive on that server was wiped. (This simply removes customer data and software that TTI has more current versions of elsewhere.) While the complaint does not mention any other servers, I also have two Owl servers in my house. Again, they are not being used by me or eSpear, the disk drivers were wiped, and I have no conceivable need or desire for these devices. I would appreciate them being picked up, or TTI agreeing to let me throw them out or donate them to charity. (Since these two Owl servers are not mentioned in the complaint, I do not think it necessary to burden the Court with copies of the multiple emails that I have written to TTI about them.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 2, 2017

_____
Jonathan Arnold